**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CECILIA MEEHAN,                                        :
          Plaintiff,                                 :
                                     :
v.                                                     :          3:08-cv-877 (WWE)
                                     :
DAVITA, INC.,                                          :
          Defendant.                                 :

**MEMORANDUM OF DECISION ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cecilia Meehan brings this action under the Age Discrimination in
Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA"), and Title VII of the Civil Rights Act
of 1964, 42 U.S.C. §§ 2000 et seq. Now pending before the Court is defendant's
motion for summary judgment (Doc. #54). For the following reasons, defendant's
motion will be granted.

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted briefs, a stipulation of facts and supporting exhibits,
which reflect the following factual background.

Plaintiff began working for Gambro Healthcare, Inc. in 1999 when Gambro
acquired St. Francis Hospital and Medical Center in Hartford, Connecticut. At that time,
plaintiff was a clinical nurse manager. Gambro was a large dialysis company that
oversaw the dialysis operations at St. Francis Hospital. At Gambro, plaintiff took on
new responsibilities and job duties.

In July 2000, plaintiff quit her position at Gambro because she had a difficult time

making the transition to Gambro's corporate structure. She returned to Gambro in April 2001 as Regional Director ("RD") responsible for facilities in Hartford, New Haven, Branford, Norwich, New London and Waterbury.

Nurses in plaintiff's clinics provided feedback upon her return about her job performance. Plaintiff's evaluations from this time and earlier expressed her deficiencies in communicating with her staff, patients, doctors and visitors. The nurses informed plaintiff that they were afraid of her. After sitting down with her, however, the nurses found that plaintiff was "not scary like they thought...."

Judy Moran was plaintiff's direct supervisor while she was RD at Gambro and counseled and mentored plaintiff on her communication skills. Moran discussed comments from plaintiff's clinical managers with plaintiff and informed plaintiff of changes that would have to be made going forward. Moran, in 2001, put plaintiff on a 30-day improvement plan. In her 2003 evaluation, Moran wrote that plaintiff should "continue to work on body language to foster open communication (must work through social or emotional issues and focus on business acumen via improved financial performances and achievement of committed budged goals and objectives despite obstacles)." Moran also commented that plaintiff needed to continue improving her "Open/Active Communication" and "People Development."

In plaintiff's 2004 performance review, Moran commented that plaintiff needed to continue to work on an "open approachable style of management" and find ways to "positively motivate her team by sharing success." In her self-evaluation, plaintiff acknowledged that she had to continue working on her communication skills. Moran did not work with plaintiff after Gambro's acquisition by defendant DaVita.

In October 2005, DaVita acquired Gambro, and plaintiff became Regional Operations Director ("ROD") in the Northern Lights Division of DaVita. Her job duties at DaVita were to:

- "[m]aintain a liaison relationship between the regional office and the corporate office through attendance of meetings and written and oral communication;"

- "[e]nsure prompt corrective action is implemented ... for the facilities, equipment and systems;"

- "[f]acilitate an open line of communication with administrators and staff through staff meetings or written memorandums;"

- "[f]ormulate regional budget of overall operational expenses in accordance with DaVita policy;"

- "[d]irect and approve staffing plans to promote the maximum utilization of all personnel, and the reduction or addition of staff based upon patient load ratios, and company guidelines;" and

- "[e]nsure high quality communication with physicians, nurse practitioners and other health care professionals regarding patient care."

Certain of plaintiff's job functions at DaVita were not part of her job at Gambro. In addition, plaintiff had to account for more employees at DaVita because of a different reporting system. Plaintiff also communicated more with center directors about financial issues at DaVita than she had at Gambro.

DaVita referred to its employees as "teammates" and had a "one for all, all for one" culture among teammates. Plaintiff found the transition from Gambro to DaVita challenging. Defendant claims that plaintiff was uncomfortable with DaVita's team-building exercises. Plaintiff also thought the culture at DaVita to be "clubby" and uncomfortable because it did not fit her style. She admitted that having conversations to get "buy in" from her facilities frustrated her at times.

3

Plaintiff was responsible for ensuring that those individuals who directly reported to her received the Teammate Handbook, DaVita's employee manual, which included DaVita's equal opportunity and sexual harassment policies, and that they signed the policies and returned them to Human Resources. Plaintiff recalled receiving the manual when she started working at DaVita. Plaintiff was aware of DaVita's procedures to address equal opportunity and unlawful harassment.

There were staffing problems at DaVita's Waterbury facility that plaintiff supervised. According to plaintiff, Waterbury could not keep staff on long, and there were problems with waiting lists. Some of the Waterbury staff felt that their issues fell on "deaf ears." Dr. Joe Renda, one of the medical directors at Waterbury, told Moran that he had concerns about plaintiff's leadership, communication and oversight of the facility. Dr. Donald Felito, a medical director at the Norwich facility, blamed plaintiff when he expressed that things needed to be done or fixed in either the staff or the operations of the faculty and they were not done or fixed. Plaintiff asserts, without citation, that these complaints referred to Gambro, not DaVita.

The entire staff at the New London facility was unhappy about staffing, the machines they had, their pay, productivity models and the products that were being used. In addition, the facility also had cracks and leaks. To address staffing problems, plaintiff sometimes worked the floor as a nurse. While working for Gambro, plaintiff used contract nurses to resolve staffing issues; this was against DaVita policy. Defendant contends that plaintiff was too involved in the day-to-day activities of the individual facilities; plaintiff asserts that her testimony on this point referred to her time at Gambro. Plaintiff further testified that having to deal with certain additional

responsibilities of adapting to the changes in policies and procedures under DaVita "add[ed] stress."

Plaintiff's supervisor at DaVita was Craig Goguen, who was Vice President of the Northern Lights Division. Goguen understood that several of plaintiff's facilities were not performing well, although plaintiff received an incentive bonus for 2005. On April 20, 2006, Goguen and Tim Willerton, human resources representative for the Northern Lights Division, held a meeting with plaintiff to discuss their concerns and what plaintiff would have to do to improve and remain at DaVita. Going into the meeting, plaintiff believed that she would be terminated. She testified that Goguen stated at the meeting that he wanted plaintiff to be a part of his team if she wanted to be. Goguen told plaintiff that she would need to work on certain areas, which included building relationships with physicians and plaintiff's management style. Goguen further instructed plaintiff to take some time over the weekend to determine whether she wanted to remain on the team. Plaintiff testified that Goguen told her that if she decided to stay on the team, he would work with her to improve. Plaintiff called Goguen the following Monday to tell him that she wanted to remain a member of the team.

Plaintiff then began having biweekly meetings with Goguen and Willerton about the issues discussed at the April 20 meeting. On May 5, plaintiff sent an initial action plan to Goguen and Willerton. Among the deficiencies that plaintiff identified in the action plan were: "Top down/mandate-driven management style, lack team, CD involvement, buy-in to decisions;" "relationship building with MDs;" and Norwich and New London Plans. Plaintiff continued to hold meetings to get feedback from the center directors on her progress. Plaintiff testified that she could remember little that

was discussed at the meetings, but that a New London meeting became "ugly at certain points." Carol Miller, another ROD, spent time at plaintiff's New London and Norwich facilities with Goguen's approval to help plaintiff improve.

Around this time, in April 2006, plaintiff attended a training course for management-level teammates at a DaVita-training session. No other RODs were there from plaintiff's region. At the meeting, DaVita held training sessions on relationships with center directors and on how to deal with employee issues, confrontational issues and other matters encompassed in "The DaVita Way of Management."

Plaintiff continued to meet with Goguen and Willerton every two weeks from April 2006 until her termination at the end of August. She also continued to circulate her plans of action every two weeks to help improve deficiencies included in her May 19 and June 2 action plan updates. The action plans show that plaintiff continued to face staffing difficulties in multiple facilities.

On June 6, Dr. Renda, medical director of the Waterbury facility, sent an email directly to Goguen stating:

> Has anyone recently seen the length of our waiting list? Patients stay in the hospital for days, and office patients wither away with uremia. The bottom line is that we are not practicing nephrology, but simply trying to avoid catastrophies [sic]. Both hospitals are often full and are still expected to shoulder the responsibilities that Davita has placed upon them. No patient in need is turned away, which is more than I can say for Davita. The situation is approaching crisis proportions and I see little progress in trying to correct it. Several other vendors have approached us, since the need in Waterbury is obvious. We need to have a meeting soon or we will be forced to explore other solutions. So far our meetings with Davita have been simply talk, with little action.

Plaintiff understood that if she failed to work on these areas, she would not be

successful at DaVita.

In August 2006, Goguen and Willerton had a meeting to inform plaintiff that she was being terminated. Goguen prepared talking notes for this meeting in which he wrote his reasons for terminating Goguen. These reasons included plaintiff's inability to proactively develop plans and creative ideas to drive larger improvements and change; the fact that plaintiff was too reactionary and did not trust the leadership team and peer teams and believed that everyone was out to throw her "under the bus." Plaintiff was told that she was not going "fast enough" for what Javier Rodriguez, Divisional Vice President, would like. Plaintiff did not say anything to Goguen or Willerton except "okay." She was replaced by a man in his thirties.

While employed, plaintiff never complained to anyone at DaVita or anywhere else that she felt discriminated against based on her age, gender or any other reason. Other than the termination itself, no one at DaVita took any action toward plaintiff that made her feel discriminated against. No one at DaVita ever made a comment to plaintiff about her age or referenced it with regard to her termination.

Plaintiff believes that she was terminated because DaVita wanted to replace her with someone younger who more fit their mold. That mold, plaintiff testified, was "younger, usually male, many Harvard-educated."

Plaintiff testified that she believed that four other women over the age of forty were terminated by DaVita. These women were Judy Moran, Yvonne McHorney, Betty Simard and Denise Sullivan. Plaintiff believed that McHorney had an understaffing problem in at least one of her facilities, but that her other facilities were doing well. Plaintiff testified, however, that she did not knew "all aspects" of the circumstances of

McHorney's departure.  Plaintiff further testified that she know "very little" about Moran's separation from DaVita or the circumstances regarding Simard's termination.  Plaintiff recalled Simard having staffing errors at a couple of her clinics.  Plaintiff was unsure of the circumstances of Sullivan's departure from DaVita or who replaced her.

Plaintiff stated that she had heard that "a particular regional vice president cleared out all his regional directors in one day and filled them with younger people from, some of them from the Harvard connection."  Plaintiff could not recall who made this comment or who the subjects of the comment were.  Plaintiff also testified that she heard "chit chat" about "somebody who was too old to be doing their job" but could not remember who the person was.

Moran testified that Rodriguez made ageist and sexist comments about the "need to have young, new dynamic leaders in the organization.  He would comment ... about women in the organization need to act more like a man to be effective."  Moran testified that during the merger, when two positions were merged, the more senior employee would be let go and the younger kept.  Moran further testified that in the New England area, all the managers over fifty were phased out, and the only one kept was in her thirties.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a

reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

Plaintiff alleges that defendant discriminated against her based on her age and gender by terminating her.  Defendant asserts that plaintiff cannot demonstrate that its legitimate business reasons for terminating plaintiff were pretextual.

Plaintiff's claims under Title VII and the ADEA are evaluated similarly under the

9

burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[1] Thus, the Court will first consider whether plaintiff has set forth a prima facie case. It is well-settled that to establish a prima facie claim of discrimination, the plaintiff must demonstrate that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Although the plaintiff's initial burden is not onerous, she must show that her termination was not made for legitimate reasons. Thomas v. St. Francis Hosp. and Med. Ctr., 990 F. Supp. 81, 86 (D. Conn. 1998). The burden of establishing this prima facie case in employment discrimination cases is minimal. McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).

If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. Once the defendant has articulated such a reason, the question in reviewing a motion for summary judgment is whether the evidence is sufficient to sustain a reasonable finding that the legitimate, non-discriminatory reasons proffered by the defendant were false or pretextual for discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

The key distinction in evaluating an age discrimination claim versus a sex

---

[1]    In Gross v. FBL Financial Services, Inc., the Supreme Court noted that it "has not definitively decided" whether the burden-shifting framework of McDonnell Douglas is appropriate in the ADEA context. 129 S. Ct. 2343, 2349 n.2 (2009). After Gross, under Second Circuit precedent, the McDonnell Douglas framework remains appropriate, Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010), and this Court will continue to apply it to ADEA claims as it did prior to Gross.

discrimination claim is that there can be no mixed-motive age discrimination claim while there can be a mixed-motive sex discrimination claim.  Compare Gross, 129 S. Ct. at 2352 ("[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."); Gorzynski, 596 F.3d at 106 ("Gross changes the latter part of this formulation by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases."), with Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (stating standard for demonstrating discrimination in mixed motive case under Title VII); Rose v. N.Y. City Bd. of Educ., 257 F.3d 156 (2d Cir. 2001).  Accordingly, to defeat summary judgment on her ADEA, plaintiff must show that defendant's proffered non-discriminatory explanation for the action that it took in terminating her was pretextual and that there is no basis upon which a jury could conclude that plaintiff's termination was reasonable.  As to plaintiff's gender discrimination claim, she can defeat summary judgment by showing that her gender played some role in her termination, regardless of any other possible explanation offered by defendant.

**I.      Plaintiff's Age Discrimination Claim**

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...."  29 U.S.C. § 623(a)(1).  To prevail on an ADEA disparate treatment claim, a plaintiff must prove "that age was the 'but-for' cause of the challenged adverse employment action."  Gross, 129 S. Ct. at 2352.

Plaintiff is a member of the class of individuals protected under the ADEA insofar as she is over the age of forty.  In addition, her termination qualifies as an adverse employment action.  Defendant asserts that she was not qualified for her position.  The Court will not address this point but will assume that plaintiff was qualified.  Despite this, plaintiff cannot show that there is an inference of discrimination in her termination.  Plaintiff attempts to show that other employees older than forty were also terminated.  Neither plaintiff nor Moran knew the circumstances regarding the termination of those employees, however.  The lack of sufficient detail based on personal knowledge of the witnesses is fatal to plaintiff's argument.

Even if plaintiff had more information, allegations that employees were terminated and replaced by younger employees, without more, do not suffice to defeat summary judgment.  Stouter v. Smithtown Cent. Sch. Dist., 687 F. Supp. 2d 224, 234-35 (E.D.N.Y. 2010) (citing cases); O'Sullivan v. New York Times, 37 F. Supp. 2d 307, 319 (S.D.N.Y. 1999).  Plaintiff's observations that supervisors wanted Harvard-educated employees do not present an issue of material fact.  Therefore, summary judgment is appropriate.

Even if the Court assumes that plaintiff has demonstrated a prima facie case of age discrimination, defendant has articulated a legitimate, non-discriminatory reason for terminating plaintiff as it has shown that plaintiff was unable to meet her responsibilities at DaVita.

Plaintiff does not dispute that she had performance issues after DaVita acquired Gambro.  She claims, however, that these issues were resolved by 2005.  The evidence, however, does not support this view.  Beginning in April 2006, she had

biweekly meetings with her supervisors regarding her performance and ways to improve it.  Furthermore, Dr. Renda's criticism of the Waterbury facility's operations was made in June 2006.  The evidence demonstrates that plaintiff's performance continued to suffer.  She does not dispute complaints about her performance or claim that her meetings with Goguen and Willerton were unreasonable or that the complaints were created to cover up discrimination.  See Gorzynski, 596 F.3d at 107-08 (reversing summary judgment where negative evaluation occurred under circumstances suggesting discriminatory motives).  Plaintiff does not argue that other, younger employees were treated differently, and she does not identify any potential comparators.  See Holowecki v. Federal Exp. Corp., 644 F. Supp. 2d 338, 353 (S.D.N.Y. 2009), aff'd,382 Fed. Appx. 42 (2d Cir. 2010) ("[Plaintiff] does identify a handful of younger couriers who 'remained employed' at his station after his termination, but fails to demonstrate how any of these individuals were treated differently under circumstances similar to his. Because [plaintiff] has offered nothing more than conclusory allegations in support of his age discrimination claim ... his claim must be dismissed.").

In light of the evidence before the Court, a reasonable jury could not conclude that plaintiff's rights under the ADEA were violated.  Plaintiff's ADEA claim will be dismissed because she cannot has not demonstrated a prima facie case or shown that defendant's reasons for plaintiff's termination were pretextual.

## II.    Plaintiff's Sex Discrimination Claim

Plaintiff's sex discrimination similarly suffers under both the pretext analysis of McDonnell Douglas and the mixed-motive analysis of Price Waterhouse v. Hopkins,

13

490 U.S. 228, 258 (1989) (plurality opinion).

Under the McDonnell Douglas framework, plaintiff can demonstrate that she is a member of a protected class and suffered an adverse action.  She cannot however show circumstances that raise an inference of discrimination based on her gender.  The evidence that plaintiff has of discrimination based on gender consists of statements made by Rodriguez.  These statements cannot support a claim for gender discrimination for two reasons.  First, plaintiff has proffered no evidence that Goguen or Willerton shared Rodriguez's sentiments.  Second, there is no evidence that Rodriguez was a decisionmaker involved in plaintiff's termination.  His comments cannot demonstrate discriminatory animus on the part of Goguen or Willerton absent some evidence, which there is not, that Rodriguez was involved in the decision to terminate plaintiff.  See Raskin v. Wyatt Co., 125 F. 3d 55, 60-61 (2d Cir. 1997) (plaintiff must offer evidence connecting discriminatory statements to decisionmaker).  Without such evidence, Rodriguez's opinion constitutes a stray remark, and a stray remark by an employee does not prove discriminatory animus unless there is a causal connection to plaintiff's alleged adverse employment action.  See Townsend v. Clairon Inc., 26 Fed. App'x 75, 78 (2d Cir. 2002); Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (remarks were not "stray" where "other indicia of discrimination" tied them to the adverse employment action).  Therefore, summary judgment is appropriate.

Plaintiff argues that her Title VII claim should be evaluated under the mixed-motive analysis of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  To succeed under this analysis, plaintiff must present evidence to show that "an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision."

De La Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs., 82 F.3d 16, 23 (2d Cir. 1996).  If plaintiff succeeds in presenting such evidence, the burden shifts to the employer to show that it would have made the same decision anyway. Raskin, 125 F.3d at 60.  The standard to defeat summary judgment on a mixed motive analysis is higher than to show a prima facie case under McDonnell Douglas.  See De La Cruz, 82 F.3d at 23.  Evidence that would meet this standard includes policy documents or statements by a decisionmaker.  Raskin, 125 F.3d at 60-61; Lightfoot v. Union Carbide Corp., 110 F.3d 898, 913 (2d Cir. 1997).

Here, plaintiff's evidence consists solely of Rodriguez's statements.  As noted above, there is no evidence showing that Rodriguez was involved in the decision to terminate plaintiff.  Conclusory allegations that Rodriguez was Goguen's supervisor and, therefore, involved in the termination are insufficient to defeat summary judgment. Therefore, summary judgment is appropriate under a mixed motive analysis as well.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Doc. #54) is GRANTED.  The Clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this 15th day of December, 2010.


_____/s/_____
Warren W. Eginton
Senior United States District Judge